Julian Zuk's sentence is substantively unreasonable because it is grossly inadequate in light of his offense conduct and in light of the objectives that Congress has set forth for sentencing courts to consider. The government does not dispute, of course, that district courts have a lot of discretion when it comes to determining a defendant's sentence as a matter of the substantive reasonableness. But in this case, well, this court in Howard recognized that there has to at least be some between the defendant's sentence and the sentences of other defendants with similar criminal histories. In this case, the district court abused its discretion because it created an unwarranted sentence disparities between Zuk and other similarly situated defendants. He also, the sentence fails to provide just punishment that takes into account. I get you on that. The question I'm looking for is what's the limiting principle here because I don't want to just open the door. There's a lot of questionable things about what happened below. But I don't want to open the door broadly to appellate review district court sentencing discretion because this principle can cut all kinds of different ways. We've been very sparing in finding things substantively unreasonable. So just tell me what the limiting principle is here. How do we respect the points that you've made but at the same time not just get ourselves into a freewheeling review of district court sentencing discretion? I think I would respond with a couple of specific errors that occurred in this case that do not occur in most cases. And of course, you know, the government benefits as often as we don't benefit from the exercise of district court's discretion. But here are a couple of specific things. First of all, the district court relied principally on one factor. And the district court acknowledged that it relied principally on Zuk's autism spectrum disorder. So the district court relied on one rehabilitative, the need to kind of provide rehabilitative or services, and elevated that concern over all other sentencing objectives. And that makes a difference. This court in both Howard and in Engle recognized that a district court errs. So I think this court can find... I understand that. The only question I have is in the 3553A factors, a district court in a lot of the sentencing records that I've read do emphasize one factor above all others. It's not usually a disability. More often what we say is the need for punishment for a particularly heinous act or the need for... to provide adequate deterrence. And sometimes when you look at a sentencing transcript, you'll see that the need for punishment and deterrence is very much the driving factor. So we don't want to get into a situation of where the emphasis of one 3553A factor over another is per se substantively unreasonable. So give me another limiting principle. At the end of the day, this court has to find that the reasons that were given were just... to justify the degree of the variance. So not only did Judge Voorhees elevate one consideration, in addition to that, there was a whole discounting of every other consideration. It was so out of balance. What was the degree of the variance? It was... so his guideline range was 240 months, the guideline term, limited by the statutory maximum. And the sentence that was imposed was 26 months in prison. That was a time-served sentence. So what was the percentage? So it was about a 90% downward variance. Now, I would note that in this court's decision in Abu Ali, the court recognized that percentages are only somewhat useful. And what this court stated in Abu Ali is that we're going to look at... the court's going to look at whether or not it was a major variance. And that was the terminology that was used. I don't disagree, Your Honor, but I... Sure, Gall says it, and I'm just acknowledging that this court has at least one decision that says, well, don't, you know, overemphasize percentages. But we say, yeah, 90%. 90% from his guideline range. Now, let's consider other defendants who were similarly situated. Producers of child pornography. He recognized that he was a producer. He admitted as much. Producers, the median was 309 months in prison based on the same criminal history, which was a Category 1, and a producer. That was the average sentence. The median was 240. So way down. You cannot say that that is a... that there's any semblance of consistency between a 26-month sentence and 240 or 309, even if one considers the possessors only. And I don't think that's an apt comparison in this case. Even then, the average is he gets about a third or even less than the average. I believe it was like 96 months for possessors only. One thing that concerned me is I don't think it's fair to say that this person was just a mere possessor. No, it is not. He went far beyond that. I mean, he was in touch with his 16-year-old cousin and trying to get his cousin to film video... to take video films of a 5-year-old child with, you know, sadistic acts being performed on that child. And, you know, to me, to just say, oh, he's the possessor, I mean, that sort of glosses over the severity of what was happening here. And then you have the experts testifying, well, he's not going to lay hands on. You know, he's not a danger. But you are a danger of laying hands on if you are, you know, chatting up somebody and encouraging them to send you pictures of sadistic acts being performed. Right, and I want to just make one just slight clarification, which is that the DJ was not his cousin. It was DJ's cousin that DJ was abusing. But absolutely, he was encouraging, and in fact, he had DJ write an email address on the back of that child to prove that it was a real child who had been abused in response to his request. He was ordering up custom pornography. And he admitted as much, and that is why he agreed to the production cross-reference. It was a reasonable choice because the bargain that the United States struck was, we will dismiss six counts that carry a mandatory minimum of five. We will agree not to proceed on the production, which would have carried if we had superseded a 15-year mandatory minimum. And we're going to agree that you can plead guilty to the possession offense, but you have to agree to the cross-reference. So the comparison absolutely is to the producers. And when one looks at the producers and the average criminal history category-wide, we have an unwarranted sentencing disparity. That's the first error. Another error that I want to note, though, is that Judge Voorhees said, he mentioned in explaining the sentence that it would provide just punishment because Zook's autism spectrum disorder was involuntary. So there was this notion that it's just punishment because Zook can't really be held responsible. Now that is a finding that does not have support in this record. Nobody testified that he abused children or possessed child pornography. 30,000 images, 400 videos. I mean, his collection was vast because he had autism spectrum disorder. What they said was that it impacted the offense conduct, but not that it caused it. He was diagnosed with sexual sadism, and the government's expert, Ross, who was one of the folks who diagnosed him, said this gentleman was the first one in seven years that she had ever, she'd never diagnosed anyone with sexual sadism before. Even Weinberger, the person who is the director of the Alpha program, testified that it was likely the pedophilia, it wasn't just his autism spectrum disorder that caused this offense. So I believe that the just punishment factor was misapplied, and just punishment has to take into account not only the defendant, but the victims. If we're going to consider just punishment, we have to consider everyone who is going to be affected by the choice of sentence. So this wasn't just a case where the district court sort of properly weighed, but balanced and unbalanced, we don't agree. You agreed that you weren't going to apply the production cross-reference, so where did that leave the guideline range? Your Honor, I'm sorry, would you repeat that question? I thought it was part of the plea negotiations that you weren't going to apply the production cross-reference. We were going to, yes. That you were going to. Yes, and that led to the, actually before the statutory maximum limited, it was about 300 some months, statutory maximum was 240, so that became the guideline term, under 5G, whatever it is, one point, I can't remember. And it was reduced to 16 months or 26 months. It was reduced to 26 months of BOP custody. Now, Judge Voorhees, one of the other mistakes I think that the district court makes is assuming that Mr. Zook was going to be in some kind of custody for five years, and that's just not, he's in Bureau of Prisons custody for 26 months, and the time that he received on the judgment was time served. What kind of treatment, excuse me, Judge, go ahead. The 26 months he served was really for violation of his bond, pre-trial declaration. He did, yes. He violated his bond pre-trial. Then he went up to alpha and had his three months up there. And, you know, we have lots of arguments in our brief about, you know, he said he benefited from that already, but at the end of the day we're looking at a time served 26-month sentence. And he was given the chance. He was allowed out on bond, and the first thing he did, or not first thing, but he got an iPad, and if you look at the bond violation report, you can see that some of the websites he was looking at were consistent with searching for child pornography. So he went right back to it. What kind of treatment facility is alpha? It's a residential treatment facility for sex offenders. Now most of the sex offenders that are at alpha, it's in Minneapolis. Most of the defendants or the people who are being treated at alpha are contact sex offenders, and it looks to me like most of them are adult. Sex offenders, you know, their offenses were against adults. Weinberger testified that he had had maybe six autism spectrum disorder clients in 18 years. This is not a facility that specializes in autism spectrum disorder. And Bureau of Prisons, Caperton testified that the Bureau of Prisons has treated autism spectrum disorder prisoners successfully. And in addition, I just want to note the other disparity we have here is between a wealthy defendant and a person who doesn't have the resources that Julian Zook had. And this court recognized in Engel that any sentencing approach that leads to a wealthy defendant serving less time or no time compared to one who doesn't have the same resources is impermissible. And we have a vast difference. I would respectfully suggest the district court would not have sentenced, and it was explicit, Julian Zook to 26 months in prison, if he had not been able to afford a private treatment program that the district court understood would be effective. And that's one other point is that, you know, we don't know that this treatment program is going to be effective. What is the Bureau of Prisons? You say they have a program for the treatment of the same disorder? Not only do they have a program, they use the exact same treatment modality. It's called Good Lives Matter. So the Bureau of Prisons testified that they use the exact same thing. Now, Zook argued that timing was critical, that he's young, and while his brain is still developing, he needed to get up there and get treatment. And they don't in the Bureau of Prisons typically begin it until they're closer to their release date because they want them to have the benefit of that training right before they reenter society. However, Weinberger testified that the treatment was, sure, it's better when they're young, but that it is effective at any time. It can work on anyone. So that doesn't justify the decision either. And, Your Honors, I see that my time is almost up. If Your Honors would like me to address the implied waiver of the plea, implied waiver of the government's appeal. District Court seemed to place some weight on the fact that he was provided for a lifetime of supervised release. Right. And your response is? My response is people violate supervised release all the time, and that doesn't adequately deter. We have a specific deterrence, a general deterrence, and a lifetime of supervised release does not adequately deter defendants, nor does it adequately protect the public. I wish it did. If it worked every time, we wouldn't be here so often on supervised release. It's a fairly porous regime, isn't it? Right. It is, unfortunately. I mean, we have many supervised release revocation judgments that I've probably been up here numerous times on SRV cases, and it just is not. That doesn't warrant a vast, dramatic variance of the sort that the District Court imposed in this case. All of you, any questions? We thank you, Your Honor. We've got a few more minutes. Thank you. Good morning, Your Honors. May I please the Court? I'm Andy Banzoff from Mr. Zook. Judge Voorhees' sentence in this case was substantively reasonable. I think it's important to remember at the outset that the reasonableness analysis begins with this sort of notion of, was the sentence that was imposed arbitrary? All of the Supreme Court cases talk about focusing on, was this an arbitrary decision? And I would submit that the evidence here, this was a fairly extensive sentencing hearing, two days in evidence. There were six experts that testified, both experts from the Bureau of Prisons and experts that the defendant put on. They testified to a variety of things, including the treatment at alpha, defendant's autism spectrum disorder, general sex offender treatment, and then the BOP folks talked about the treatment that the Bureau of Prisons could provide. But the government's argument is that, well, the judgment focuses extensively on this one factor. But it's clear from the judgment that really there are three things that Judge Voorhees focused on. He focused not only on the autism spectrum disorder and the treatment needs related to that specific disorder. Not the fact of the disorder, but the treatment needs that are sort of specific to that. But the defendant's age and his vulnerability while he's in custody. And those are the things that we see reflected in the judgment. Those are the factors. So this is not a case, as the government argues, where one factor is held above. What about deterrence and punishment? How is that taken into account? The court talked about deterrence and punishment, but I think that one of the things that the court focused on very specifically was deterrence and punishment for this defendant. And I think, remember, too, what the court cited when it talked about the punishment was for folks with autism spectrum disorder, custody in prison should be a vehicle of last resort. Because this is not a person who's not neurotypical, who has autism spectrum disorder, prison is an excessively harsh environment. And that was the evidence. How do we overlook the fact that... We're talking about... We're talking about something on the neighborhood as a result of the search of 13,800 images. And then we're talking about 472 videos. Ms. Ray says that the size of the collection is vast. I mean, that's unbelievable. And, Your Honor, this is what I would say in regards to that. That was what the evidence about the autism spectrum disorder focused on. When Judge Voorhees is talking about that, what he's reflecting is the testimony that folks with this disorder tend to be compulsive collectors in this sense, collectors of knowledge. Well, fine, they may tend to be compulsive collectors, but it's this compulsive collection that creates a market for this trash. And it's what enables this industry to keep going. And, you know, it's something with all those images and all those videos, he's providing a market for this stuff. With all due respect, Your Honor, what I would submit is that what Judge Voorhees looked at was the way to resolve that issue is to provide a sentence that focuses on treatment for this defendant so that he doesn't participate in this going forward and that he can overcome the compulsive nature of his disorder and that it's specialized. This is not generalized sex offender treatment. It does not necessarily work with folks with this particular disorder. They need a specialized type of treatment. Was he in treatment when he was on bail, when he was on bond? He had been to the Alpha program, but the answer is, and he had been seeing Mr. Gilbert, but he had not been at the kind of inpatient program that he's been at Alpha. There was some sort of treatment, and it apparently didn't work because it was a violation. He went back to visiting the same sites that he was before, even though he was on bond and was in a treatment regimen. And it certainly wasn't the kind of treatment regimen that we heard the testimony that he would receive and is actually receiving now at Alpha while he's there. And that's the kind of treatment that needs to be provided. And again, I think that the court here is looking at a defendant who's going to be on lifetime supervisory release. This is a life sentence. He's going to be involved with the United States government for the rest of his natural life. And to ensure that he can comply with that, he needs specialized treatment. That's essentially the judgment that the district court made. How does this sentence move respect for the law? That's one of the factors. It has to consider the severity of the offense. It has to consider the remote respect for the law. And it gives some consideration to proportionality with respect to the co-defendants. How does the judge's sentence do that? Did he consider those factors? I would argue that he does consider those factors, but ultimately decides that. And let me answer your question by sort of posing another question. The other part of the consideration about comparing these sentences is there has to be a It's difficult to compare, and the government is very quick to say, well, these are the types of punishments that are handed out for these types of offenses with persons in the same category. But there has to be an individualized sentencing determination. And there's no cases that say, or there's no case that the government has pointed to that says, well, a person with these specific individual characteristics has a sentence X. You can have an individualized sentencing consideration, but then you get into some individual factors that are really kind of disquieting. And one of the things that disturbed me most was the communications that he had with DJ, who was a 16-year-old boy, and he was trying to get DJ to perform sadistic acts on DJ's 5-year-old cousin. Five years old! And then he wants all kinds of verification that the sadistic acts on a 5-year-old child are somehow real, in real time, and not stale. And the whole thing, and I'm a big believer in district court discretion at sentencing, but on the other hand, when you consider the vastness of extensive nature of the acts in which he's engaged, and at the end of the day, he gets time served, I don't get it. I have enormous respect for the district judge here, but Congress and the Sentencing Commission and everybody, they take the whole issue of child pornography very seriously, as they should. And this is a poster child of a bad offender, and he gets time served. And then, what does that do to society's efforts to, they'll never, unfortunately, be able to stamp out this plague, but Congress has required some efforts that we really take these infractions seriously. Your Honor, I don't disagree with that, and I don't think the district court would disagree with you about that, and I think the district court did take this seriously. What I would submit to the court is the district court considered the need, specialized need for treatment for this individual as being a factor that was exceedingly important. And really and truly, as Kimbrough tells us, the court can tailor the sentence based upon all the statutory factors, and treatment is one of the statutory factors. Again, that in light, in conjunction with the fact that this defendant is going to be under supervised release for his natural life. But then are we going to have a situation where everybody possesses this vast collection of child pornography, and somebody goes and cites this particular case and says, well, I'm in a position because of my relatively comfortable means to afford this kind of treatment, and the Fourth Circuit's put it in for my tour on a treatment response for wealthy, fairly well-to-do child sex offenders and child pornography offenders. I mean, what kind of example does that set throughout the circuit? I mean, are we given a green light to, even if something is this extensive, that treatment alone essentially is a viable sentencing option? I mean, we have to think of what kind of signal we would be sending. I understand that, but I think the other side of that is that the problem with this treatment that I think the court was faced with with the Bureau of Prisons is we're talking about, I mean, the government's position is, well, when he's 36 years old, he should get this treatment after 20 years in prison, that he should start to receive this treatment. And the evidence the district court was faced with was, this treatment is more effective and more likely to be effective if this treatment is received while the defendant's brain is still developing. As an adult male, but before he's 25 years old. So the court has this evidence and has this specific evidence, and I would submit, this doesn't open the floodgates to every child pornography defendant coming in and saying, well, if I had the money, I could do this, I could do that. Really the question is more about the evidence that was presented. What you're talking to me about is speculative and futuristic, and what I'm talking to you about is what is the extensive, vast nature of what was done. And the, well, we've been over and over, and I don't want to keep chewing this thing, I don't want to keep chewing the bone, but whether the BOP thing is better or whether alpha is better or whatever, that seems to me a little iffy. We don't know. The one piece of evidence we do have is that when he was on bond and when he was in a course of treatment, it didn't work. And I think that that underscores the importance of being in the program that the district court judge put him in, this more advanced program that's focused on dealing with his specific needs. The district court judge had the option of requesting the Bureau of Prisons to give him the treatment early on. Maybe they wouldn't do it, but the district court judge had that option, did he not, to ask the Bureau of Prisons to give him this treatment early as opposed to late. As I understand it, district court judges have always told me we can make a recommendation to the Bureau of Prisons, but the Bureau of Prisons does what the Bureau of Prisons does. And the testimony that was presented was it was likely, if not certain, that the defendant would receive it in the last 18 to 36 months of his period of incarceration. So certainly the court could have ordered that, but the court, I think, properly knew that that was a dead letter. That wasn't going to be enforced or likely to be applied based upon the evidence, again, that was presented at this very extensive sentencing hearing. And I think that what I would argue to the court is that all of this comes back to the evidence that was presented. The government's unhappy about the sentence that was imposed, but they don't have much explanation for why the evidence presented doesn't support that. The evidence that was presented was very specific to this defendant and the treatment needs and the arguments that were presented by counsel therein. If I could move very briefly to talk about our argument that the implied appeal waiver prevents the government's appeal in this case, I would submit that Guevara still is the law of the circuit. Guevara announces a policy that appellate waivers should be mutual. Didn't you, in the pre-trial agreement, clearly indicate, very clearly, wasn't it indicated, that the government retained its right to appeal? That's true. And the suggestion of an implied waiver would apply in a case where there's silence. Well, I would submit that the Bowe case tells us that when there is no limitation, and the Bowe case was a case where the court made it very clear, there was no limitation on the government's right to appeal. Now, I would concede that it's silent as to that fact, but the court says silence is essentially the same as if there was no limitation. There's no limitation here either. But there is a limitation. Didn't the government indicate that they retained their right to appeal the defendant way it did? Well, there's no limitation on the government's appellate rights. I mean, the government is essentially retaining all of its appellate rights in the same way that it was in the Bowe case. And in the Bowe case, the court said, well, we're going to look to the scope of the waiver that's applicable to the defendant to determine the scope of the waiver that's applicable to the government, when there's no limitation on their right to appeal. And, again, this is not a simple matter of contract. U.S. v. Harvey tells us very clearly these plea agreements are an amalgam, amalgam is the word that they use, of both constitutional and due process considerations, policy considerations, and at the end, supervision of the courts, and at the end of it, private contract concerns. So certainly those are factors, but this is not – these are parties with unequal bargaining powers, the courts certainly know. Well, what's the purpose of putting that language in there, that the government retained the right to appeal after it's all over? The argument is that the government does not have a right to appeal. What's the purpose of putting that language in the plea agreement, knowingly putting it in there? Well, the government knowingly put it in there. Well, the defendant's counsel was part of that negotiation. Certainly, but as the court well knows, the courts are – the parties are entitled to interpret those revisions in light of circuit precedent. So there's any number of explanations for that, but I would certainly argue that that isn't necessarily binding, and there's been no case that's ever – there's been no published opinion that has held that. The right of the inclusion in the plea agreement of that – this broad reservation of rights somehow means that we're very – is a circumvent to this mutuality requirement. The cases cited by the government are all cases – three of those cases are cases where the defendants try to come in and say, well, we're – this is mutual, so you can't bind us by our public waiver. They're not circumstances with the exception of the last case, the 2010 case, where it is the government's appeal, but the court in that case talks about the appeal in a footnote and really says this is a case we're sending back because the court didn't have the benefit of our recent – reasonableness more than substantive reasonableness and really not a question about the public waiver. So there really isn't those cases. I would submit that the Boe case does stand for the proposition that these mutuality considerations, when there's no limitation on the government's waiver – on the government's appellate rights, that those mutuality considerations still exist. Those are due process rights, I would argue, under Boe, and we look to the scope of the waiver of the defendant. If there's no limitation on the government's right here, then arguably what good is there putting a limitation on a defendant's right? If there can't be mutuality, then as Guevara acknowledges, then maybe that opens the floodgates the other way. So I would submit that Guevara still is the law in this circuit and that this court should limit the government's right to appeal the sentence in the same way that Boe did, looking at the scope of that waiver as applied to whether or not the defendant could have appealed the sentence in the same way. We thank you, sir. Thank you. Thank you, Your Honors. Just a few quick points. First of all, the testimony from Mesenboff, one of the experts, was that one in 40 boys has autism spectrum disorder. So there would be a run on therapists for – and Julian Zook was not diagnosed until after he committed his offenses. So one of the government's concerns about this decision by the district court is that it will encourage folks to simply go and try to get an autism spectrum disorder diagnosis after the fact. And we know that a large percentage, or a certain percentage, not a large percentage, but a certain significant percentage of the defendants who have been convicted of child pornography offenses probably do have autism spectrum disorder. It simply isn't in the case law because it's never been an issue before, not been a defense. And it is not a defense. Second thing is a large percentage of his collection involves sadistic or masochistic. There's some testimony by the FBI agent. That's just to note that it was – Well, this case would just open up a massive floodgate in child pornography treatment. It would be the whole trajectory of it would veer toward no matter how heinous the offense is, the sentencing is treatment rather than punishment. Right. And accepting responsibility for what you've done. And consideration of the victims. Yes, and consideration of the victims who have been the victims of these horrible acts. And so to just put a seal of approval on what the district court would do and would lead to a sea change in sentencing, we would be totally at odds with what Congress and the Sentencing Commission have wanted. It's a crime. It's a crime. And if something is a crime, you accept responsibility for it. And it's not a mental disorder which treatment is the option. And Judge Wilkinson, that's one of the reasons we took the unusual step to appeal. We don't appeal every sentence we're unhappy with. And the Solicitor General authorized this appeal because of the concerns about the implications of this decision, in part, and the determination that it was not supportable. It was substantively unreasonable. On that point, I do want to note that members of Zook's own online community got between 96 and 222 months in federal prison. So even based on the others who were in sort of online, DJ himself got 50 years in Texas state prison. Just quickly on the plea agreement issue, I don't think I need to address that much. I would say, though, that Bo was silent on the question of whether the government could appeal. And as a result of Guevara, the government began including language that the government would retain its right to appeal as long as that appeal was authorized by the Solicitor General. Guevara simply doesn't govern. I would be and invite this court to issue a published decision holding that the government does not waive its right implicitly. The defendant wants to change the agreement. I don't think he wants to get out of it. This was an agreement that was enormously beneficial to him. Even with a remand and a new sentence, it was still beneficial. And so he wants to alter it, and this court just should not permit that based on some implicit term. We have an explicit term, and contract law does apply, as this court well knows. If your honors don't have further questions, the United States respectfully requests that this court vacate the defendant's sentence and remand for resentencing. We thank you very much. We will come down and greet counsel, and then we will come back and proceed into our final case.
judges: J. Harvie Wilkinson III, Paul V. Niemeyer, Raymond A. Jackson